# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
November 27, 2012 Session

## STATE OF TENNESSEE v. GABRIELLA M. DORADO

**Appeal from the Criminal Court for Knox County**
**No. 96437     Jon Kerry Blackwood, Judge**

**No. E2012-00308-CCA-R3-CD - Filed May 17, 2013**

The Defendant, Gabriella M. Dorado, pled guilty to attempted possession with intent to sell a Schedule I controlled substance, simple possession of a Schedule VI controlled substance, and possession of drug paraphernalia.  Pursuant to the plea agreement, the trial court sentenced the Defendant to an effective six-year sentence to be served on supervised probation.  Thereafter, the Defendant filed a motion to withdraw her guilty plea, claiming that she received the ineffective assistance of counsel, which constituted a "manifest injustice."  After a hearing, the trial court denied her motion.  The Defendant appeals the trial court's denial, claiming the trial court erred when it found that she had not proved that Counsel's representation prejudiced her.  After a thorough review of the applicable law and the record, we affirm the trial court's judgment.

**Tenn R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR. and CAMILLE R. MCMULLEN, JJ., joined.

Ann C. Short, Knoxville, Tennessee, for the appellant, Gabriella M. Dorado.

Robert E. Cooper, Jr., Attorney General and Reporter; Deshea Dulany Faughn, Assistant Attorney General; Randall Nichols, District Attorney General; Phil Morton, Assistant District Attorney General for the appellee, the State of Tennessee.

## OPINION
### I. Facts

This case arises from the execution of a search warrant in a residential home leased by multiple people.  The search of the residence resulted in the recovery of illegal drugs and

paraphernalia associated with the sale and use of drugs. The Defendant was one of the residents of the house, and police officers recovered from her bedroom 3.9 grams of Psilocybin or "mushrooms," 20 grams of marijuana, digital scales, marijuana pipes, a marijuana grinder, and $200.00 in cash. The Defendant was arrested and charged with possession with intent to sell a Schedule I controlled substance, a Class B felony, possession with intent to sell a Schedule VI controlled substance, a Class E felony, and possession of drug paraphernalia, a Class A misdemeanor.

The general sessions court appointed an attorney ("Counsel"), who negotiated a plea agreement to be transferred to criminal court by information. The Defendant plead guilty to attempted possession with intent to sell a Schedule I controlled substance, a Class C felony, simple possession of a Schedule VI controlled substance, a Class A misdemeanor, and possession of drug paraphernalia, a Class A misdemeanor. Pursuant to the plea agreement, the Defendant was to be sentenced as a Range I standard offender to six years for the attempted possession with intent to sell a Schedule I controlled substance and eleven months and twenty-nine days for each of the two misdemeanor convictions. The sentences were to run concurrently and the effective six-year sentence was suspended to supervised probation. Thereafter, the Defendant retained a new attorney and filed a motion to withdraw her guilty pleas, which is the subject of this appeal.

## A. Guilty Plea Hearing

At the guilty plea submission hearing held on February 4, 2011, the Defendant stipulated to the following facts presented by the State as the basis for the plea agreement:

> [O]n September 2nd, 2010, members of the Knoxville Police Department executed a search warrant at 6401 Nightingale Lane, Apartment 189, an apartment where this [D]efendant resided. During the search of the bedroom attributed to her, officers found 13 grams of psilocybin, which is also known as mushrooms, together with 20 grams of marijuana, along with digital scales, marijuana pipes, marijuana grinder, and $200 in U.S. currency.
>
> She was Mirandized after being arrested and admitted to possession of these mushrooms and marijuana and also selling them.

After the State's recitation of the facts, Counsel added that the Tennessee Bureau of Investigation ("TBI") report indicated 3.9 grams of psilocybin rather than the 13 grams as announced by the State.

The Defendant testified that she was twenty-three years old and "a year away" from

2

attaining her bachelor's degree. She stated that she would be enrolling in graduate school in Fall 2012. The trial court reviewed the charges against the Defendant and the agreed upon sentences, and the Defendant affirmed her understanding of the charges and sentences. The trial court then reviewed each of the Defendant's constitutional rights with her, and she affirmed that she was willingly choosing to waive her rights to enter the plea agreement. The Defendant confirmed that she was stipulating to the facts as recited by the State. The Defendant told the trial court that she understood the plea agreement as announced and that she had no questions about the agreement. The trial court confirmed that the Defendant understood the convictions could be used against her in subsequent prosecutions. The Defendant then entered a plea of "guilty." The trial court accepted her plea, finding her guilty in each charge, and sentencing her to an effective sentence of six years to be suspended to probation.

## B. Motion Hearing

On March 2, 2011, the Defendant filed a motion to withdraw her guilty plea, asserting that Counsel was ineffective. At the hearing on the motion, the parties presented the following evidence: Sarah Compher-Rice, an attorney, testified that she met with the Defendant in October 2010 regarding these charges. Compher-Rice said that she reviewed the search warrant and talked with the Defendant several times over the telephone about the circumstances surrounding the search. The search warrant did not identify the Defendant and the Defendant told Compher-Rice that there was a private lock on her bedroom door. Based upon this information, Compher-Rice felt "it certainly seemed that there would be an issue with the search warrant and a possible illegal search and seizure for the items that were associated with [the Defendant's] case." She said that, had she taken the case, she would have wanted to research the search warrant and search "in more detail." Compher-Rice explained that the Defendant was unable to retain Compher-Rice, so she referred the Defendant to another attorney, Jonathan Cooper.

On cross-examination, Compher-Rice testified that she was unaware that the Defendant had given a confession. Compher-Rice clarified that she did not believe the search warrant in this case was a "bad search warrant," but she believed there was an issue for further investigation.

Jonathan Cooper testified that he met with the Defendant on October 27, 2010, regarding legal representation. Cooper said that he reviewed the search warrant and spoke with the Defendant about the circumstances surrounding the search. The Defendant told Cooper that she lived in a house with three other women and that her bedroom had a separate lock. Cooper said that, because only the address of the residence and not the Defendant's name was listed on the search warrant, he believed there was a potential issue with regard

to the search warrant that necessitated further research. Ultimately, however, the Defendant was unable to retain Cooper.

Cooper testified that, when researching a legal issue, he tries to "stick with. . . Tennessee case law." If there were no cases on point, he would look for either relevant cases to "frame" his approach or look to case law from other states.

Laurie Pickle testified that she is the property manager for Londontown Apartments. Pickle explained that there are two separate complexes on the property she manages. The Londontown Apartments were located on one side of the property and The Villas at Londontown were on the other side. One of the rental units, where the Defendant resided, was a five-bedroom, two-story, white house, Unit 189. Pickle said that the house had two full bathrooms upstairs and two half bathrooms located downstairs. The lease agreement for this property for February through September 2010 listed Tara Williams, Hillary Lewis, the Defendant, and Erica Aldridge as the lessees. Pickle said that rent for this unit could be paid through multiple checks, but the payment had to be made at one time.

On cross-examination, Pickle described Unit 189 as a single family, two-story house with white wood siding. She said that there was an overhanging roof at the front of the house supported by four large white columns. She confirmed that there were five windows with black shutters on the front of the house. Posted above the front door were three-inch gold numbers, "189." The address for the home was 6401 Nightingale Lane. Pickle agreed that the house is across from the property pool and that the laundry room was attached to the back of Unit 189. Pickle testified that the unit was rented under one lease and that there were not separate living quarters. Pickle said that she tried to discourage residents from placing locks on unit doors in case of an emergency. She said that, if a resident did want to use a lock, they were required to make management aware of the lock and provide access. Pickle said she was not aware of any padlocks being used by tenants in Unit 189, and she did not have a key for any interior door lock for that residence.

The Defendant testified that she was twenty-three years old and a student at the University of Tennessee with a 3.6 grade point average. She said that she had recently changed her major from Biomedical Anthropology to English and, upon graduation, she planned on teaching through Teach for America. The Defendant stated that a felony drug conviction could affect her admission into Teach for America.

The Defendant testified that her father was Bolivian and that she was born in Bolivia. She said that her father moved to the United States to attend college where he met her mother. The Defendant's family moved to Knoxville for her mother to pursue a master's degree in Animal Sciences at the University of Tennessee.

4

The Defendant testified that, in addition to her classwork, she worked as a nanny caring for four children and was a dancer with Momentum Dance Lab. The Defendant testified that her attorney ("Counsel") never asked her about her background information, family, work ethic, or her personal pursuits.

The Defendant testified that on September 2, 2010, she and three roommates lived at 6401 Nightingale Lane, Unit 189 in the Londontown Apartments complex. The Defendant said that there was a living room, dining room, kitchen, laundry room, and half bathroom that were "common areas." The Defendant said that she did not consider her bedroom a "common area," and she placed a padlock on the door to her bedroom. Further, because her bathroom opened to both her bedroom and an adjoining bedroom, she kept the door from her bedroom into the bathroom locked. The Defendant testified that none of her roommates had a key to unlock the padlock on her bedroom door.

The Defendant testified that there was one mailbox for the residence and each of the roommates had a key to the mailbox. The Defendant paid her portion of the rent with a personal check, which was placed in an envelope with her roommates' rent checks and taken to the apartment complex office.

The Defendant testified that on August 12, 2010, she was involved in a six-vehicle accident. The Defendant said that, during the execution of the search warrant and after police officers had opened the Defendant's door, Lydia Mills identified the Defendant's bedroom to the police officers using the Defendant's name. One of the police officers responded to Mills, saying, "Oh, wasn't she in a car wreck a couple of weeks ago? How is she doing?" The Defendant said that she relayed to Counsel this exchange between the police officer and her roommate that occurred during the execution of the search warrant.

The Defendant testified that she went to school on the morning of September 2, 2010. Before leaving for her class, she checked to make sure her bathroom door was locked and she locked her bedroom door. The Defendant testified that she was "always very careful to do that" because she "didn't want anybody in [her] room without [her] knowledge or permission." After her classes, the Defendant returned home where she found a police officer on the porch of the house with one of her roommates and a friend of one of her roommates. The Defendant provided the police officer with her identification, and the officer directed her to sit down on the porch, where she remained for forty-five minutes to one hour. As she sat on the porch, she noticed police officers taking out items from inside the house. Eventually, she was told she was under arrest and handcuffed.

The Defendant testified that she was placed in the back of a police vehicle. The police officer drove to the apartment complex office and told the Defendant that he needed to return

5

the spare key to the house. After returning from the office, the police officer drove her to the police department. She was taken into an office area where there was a police officer. As she waited in the room, the police officer began showing her pictures of illegal drugs from other case files and asking what her "stuff" was like and whether her drugs were better than the photographs of drugs he was showing her. She described the police officer as "being very buddy-buddy." She said that the police officer never told her that she did not have to respond to any of the statements he made to her.

The Defendant testified that, after approximately an hour, she was taken to a room where Officer Geddings questioned her. She recalled that Officer Geddings did not advise her that she was being audio or video taped during the interview. She said that Officer Geddings took notes but that he never asked her to write out anything. She said that he never asked her to review his notes for accuracy. Officer Geddings did show the Defendant a piece of paper that "said something about the rights that I had to an attorney and things like that." The Defendant signed the paper.

The Defendant said that Counsel was never provided with her signed waiver or any information regarding her interview with Officer Geddings. She said that she was concerned by this omission because she was "just not clear of what [she] actually said during that interview." The Defendant said that she remembered the officer asking her "several questions" about the marijuana. The only question the officer asked about the mushrooms was whether she had received the mushrooms from Lydia Mills. Beyond that question, the Defendant said she had no "independent recollection" of questions related to her possession of the mushrooms. The Defendant testified that she asked Counsel to find the records of the interview but that, to her knowledge, he did not. Counsel told the Defendant that he tried to access the interview information but the State denied his request.

The Defendant testified that, on the evening of September 2, 2010, she was released on bond. She returned to her house and found that it was a "total wreck." She described her bedroom as "overturned" with her personal items "just thrown onto the floor." The lock she had placed on the outside of her bedroom door had been pried off.

The Defendant testified that, at her first court hearing on the charges, she told the trial court that she wanted to hire her own attorney, so the trial court reset her case to give her time to hire an attorney. After meeting with several attorneys, the Defendant, due to financial restraints, was unable to retain counsel. At her subsequent court date, the trial court appointed Counsel to represent her. She met Counsel briefly that day and thereafter, at his office or at court appointments. She told Counsel about the circumstances surrounding the search of her bedroom, and he told her he would need to research potential issues regarding the search.

6

The Defendant testified that, to her knowledge, Counsel never went to 4601 Nightingale Lane, Unit 189 or spoke with Lydia Mills's attorney. She said that Counsel never spoke with the management of the apartment complex or asked the Defendant for a copy of the lease. The Defendant said that Counsel never asked to see the lock that she had placed on her bedroom door. She said that Counsel never interviewed any of the police officers who participated in the search.

The Defendant testified that Counsel told her that he looked for case law on a search similar to the circumstances in this case and was unable to find any Tennessee cases on point. Based upon the lack of case law, he believed that pursuit of a motion to suppress the evidence was not "worthwhile." He recommended that they, instead, continue pursuing plea negotiations. The Defendant testified that she was "disappointed," but she "trusted his advice."

The Defendant testified that Counsel told her that, if she agreed to the State's offer of six years probation and "stayed out of trouble," she could apply for judicial diversion and her record would be expunged. The Defendant explained that the opportunity for judicial diversion was important to her and, given the options of pursing a motion to suppress or pursuing a plea agreement that allowed for application of judicial diversion, she would choose to pursue judicial diversion. She stated that if judicial diversion had not been an option, she would have wanted to pursue the suppression motion.

The Defendant said that Counsel never explained to her what a preliminary hearing involved or the importance of a preliminary hearing. At a December court date, Counsel conveyed to the Defendant an offer of six years probation and the opportunity to apply for judicial diversion. The Defendant said that she had until the following court date in January to decide whether to accept the State's offer. In January, Counsel conveyed the Defendant's acceptance of the State's offer of six years probation, and her case was transferred from general sessions court to criminal court. The Defendant said that Counsel never explained to her the process of how her case was moved from general sessions court to criminal court. The Defendant identified her signature on the waiver of indictment and/or presentment form.

The Defendant said that Counsel told her it would be good for her to collect her school transcripts, honor society certificate, and letters of recommendation because she would be applying for judicial diversion. On February 4, 2011, when the Defendant arrived at the courthouse for the guilty plea submission hearing, she gave Counsel her packet of information, and she watched as Counsel approached the State's attorney. She recalled that Counsel tried to give the State's attorney the packet, but the State's attorney refused. Counsel then met with the Defendant outside the courtroom and told her that she could not seek judicial diversion. He told her that she could either "take the plea agreement or leave

7

it" and that she "had to decide right then" what she wanted to do. The Defendant said that Counsel told her if she refused the State's offer, "it was very likely that [she] would go to jail." The Defendant said she was "devastated" and began crying. Counsel told the Defendant that she had "[a] matter of minutes" to decide whether to accept the plea offer without the option of seeking judicial diversion.

The Defendant testified that Counsel never explained the implication of a felony conviction such as the loss of the right to vote, serve on a jury, or carry a handgun. He did not tell her of the implications on her ability to travel abroad or the impact on her career choices. The Defendant said that she agreed to accept the State's offer of six years on probation, and she signed "a bunch of paperwork." The Defendant said that it was during this time that she first saw a copy of the charging document.

After the plea submission hearing, Counsel contacted the Defendant and suggested that she "appeal for a lesser sentence." He told her to collect recommendation letters and send them to the District Attorney General's Office. The Defendant said that, after speaking with Counsel, she called her father and explained "the plea agreement and everything." She said her father was "very upset" and wanted to see if "there was anything that we could do." The Defendant contacted Compher-Rice again, and she referred her to her present counsel. As to the motion before the trial court, the Defendant stated that, "I just want the opportunity to be able to withdraw my plea and then just explore all my options that I have for this case."

On cross-examination, the Defendant testified that she spoke with seven different attorneys about her case. When asked in what way Counsel was ineffective, the Defendant stated that she did not "feel like maybe enough research was done in that area." She then identified her "major thing" as learning "minutes" before the plea hearing that the agreement did not include the option for judicial diversion.

The Defendant confirmed that she understood the *Miranda* warning that she signed before speaking with Officer Geddings. The Defendant stated that she did not remember telling Officer Geddings that she possessed mushrooms and marijuana and sold them. The Defendant said that she knew if she were convicted of the charged crimes, she would serve jail time. She agreed that avoiding jail time was her "overriding concern" and avoiding a felony conviction was a "secondary" concern.

The Defendant agreed that she possessed a copy of the search warrant after meeting with the first attorney she interviewed. She said that, upon reading the warrant, she had concerns about the police entry into her room in spite of the padlock she had placed on the door. She raised this concern with all three of the attorneys she initially met with and agreed that none of them told her it was a "bad search warrant" but indicated that the issue

8

warranted further research.

The Defendant agreed that she told Counsel that she did not want to go to jail, and Counsel said that he would try to negotiate a settlement that would avoid jail time. The Defendant agreed that she never told Counsel or any other attorney she met with that she wanted a jury trial and that she did not, in fact, want a jury trial on her charges. The Defendant agreed that, when she initially met with Counsel, he did inquire about her school history, future plans, and criminal record. She said that Counsel discussed the charges with her. She described the home and layout to Counsel. She explained to Counsel that the residence was not separate units within a house but a group of friends that agreed to rent a "big house" together. She agreed that kitchen and bathrooms were shared and there was one electric bill, gas bill, and water bill for the residence. The Defendant agreed that she did not have her "own separate apartment" within the house.

The Defendant agreed that Counsel did not appear to be a novice and that she trusted his judgment and suggestions. The Defendant agreed that, if she hadn't been happy with Counsel's representation, she could have asked her father to help her hire an attorney earlier in the process. The Defendant agreed that, in December, when Counsel presented her the State's offer, it did not include judicial diversion, but Counsel told her that he was still going to work toward having judicial diversion added to the plea agreement. The Defendant agreed that she did not enter the plea agreement on the December court date, in part, because Counsel wanted to make sure that the Defendant understood the offer and had time to consider it before accepting. The Defendant said that, over the Christmas holiday, she told her father about the charges and the State's plea offer. Her father suggested that he hire an attorney, but she assured her father that she had "a perfect counselor."

The Defendant agreed that her initial charge was a non-probatable felony offense and that Counsel successfully negotiated a reduction in her charge that allowed for a sentence of probation. The Defendant denied that Counsel told her in a meeting on January 14, 2011, that there would be no diversion option. She said that Counsel maintained that he was still "trying to work [diversion] into the agreement," so she believed diversion was an option. At the January 19, 2011 court appearance, the Defendant told Counsel that she wanted to accept the offer. She believed the offer to be six-years probation and an application for judicial diversion. The Defendant identified her signature on the Waiver of Preliminary Examination form, wherein the plea agreement of six-years probation was listed with no mention of diversion.

The Defendant testified that she understood that, even on the day of her plea submission hearing, February 4, 2011, she could change her mind and choose not to enter a guilty plea. She further testified that she understood if she did not enter the plea agreement,

9

her case would go to the grand jury and she then faced a non-probatable drug felony charge which, if convicted, could allow for a jail sentence. The Defendant agreed that she was happy with a sentencing option that did not include jail time. As to the Defendant's statement that she had "minutes" to decide whether to accept the State's plea offer after learning she would not be able to apply for judicial diversion, she maintained that she had a very brief period of time in which to decide whether to move forward with the agreement. She agreed that Counsel did tell her that, if she did not want to proceed with the agreement, the case could go through the grand jury instead. The Defendant agreed that the decision of whether to plead guilty was her decision. She also agreed that she heard the State announce the facts, which included her admission to possessing and selling drugs, but explained that she did not say anything to Counsel because she didn't "know if it never happened or not." She agreed that it was after talking with her father and consulting with her new attorney that she became dissatisfied with the sentence.

The Defendant testified that Counsel should have advised her that the conviction could affect her ability to travel abroad. She said that Counsel should have provided her with "as much information as humanly possible" before she made her decision of whether to enter the plea agreement. The Defendant said that, while not an "overriding concern," she felt Counsel should have advised her that, as a result of the conviction, she would not be allowed to vote, carry a handgun, or serve on jury duty. The Defendant agreed that, when she plead guilty, she had a "clear head," "intelligent mind," and understood "everything" that was being asked of her. She agreed that she "voluntarily entered" her guilty plea. She denied that any force, threat, or coercion was used to induce her plea.

Upon questioning by the trial court, the Defendant testified that all of the attorneys she spoke with told her that the range of punishment for the felony conviction was eight years to thirty years and that this "terrified" her. She said that she understood that, if she was convicted of the charged felony offense, she could not get diversion and would serve jail time.

Counsel testified that he had been practicing for a little more than a year when he was appointed to represent the Defendant. He estimated that, at that time, he had handled more than twenty cases involving illegal drugs and none of those cases went to trial. Counsel said that, at the time of his appointment in this case, he had filed several motions to suppress and conducted a hearing on one of the motions in criminal court.

Counsel testified that he gathered information from the Defendant, reviewed the search warrant, spoke with other attorneys involved in the case, and conducted legal research on the relevant issues of the Defendant's case. Counsel requested discovery but was told that he was not entitled to discovery at the general sessions level. Counsel said that he spoke with

police officers involved in the case at the courthouse, but the officers provided only information that he already knew from other sources. Counsel testified that he advised the Defendant "on all aspects of the case" and conveyed the advantages and risk involved with pursuing a suppression motion.

Counsel identified a copy of the Defendant's file he kept during his representation of her. He read aloud the following entry dated December 8, 2010: "A.D.A Phil Morton, offer six years on C felony and agreed probation, no diversion, needs to be accepted prior to next court date if she wants to take it." Counsel could not remember whether this was the first plea offer he received from the State, but, based on his notes, he believed it was the State's first offer. Counsel said that, at the time he received the offer, he did not believe he could seek diversion if it was not part of the offer. Through legal research, he later confirmed that he could not seek diversion if it was not included in the agreement. Counsel explained that, after the Defendant bound her case over to criminal court, another attorney told him that the Defendant could still seek diversion even if it was not included in the agreement. Counsel conducted research on the issue and confirmed what he had initially believed: that he could not seek diversion on the Defendant's behalf if it were not included in the plea agreement.

Counsel read the following excerpt from his file dated January 19,2011: "Judge Stansberry and A.D.A. Phil Morton accepted plea deal, plea to attempted sale of schedule I, C felony, six years agreed probation, and plea to sale schedule VI E felony and PDP.[1]" He explained that he had called the State's attorney on January 14 to notify him of the Defendant's acceptance of the State's offer as the offer required the Defendant to accept before the January 19 court date. Counsel noted that, although he had documented the agreement as requiring the Defendant to plead guilty to sale of a schedule VI drug, when he arrived in court on January 19, 2011, the information reflected that the Defendant would plead to simple possession of drugs. Upon seeing the discrepancy, Counsel said he "wasn't going to argue against [the Defendant] pleading to a lesser charge," and he did not know why the information included the offense of simple possession rather than a felony drug sale.

Counsel testified that he explained the offer to the Defendant and told her that diversion was not part of the plea agreement but that he would continue to try to convince the State to include application for judicial diversion. Counsel said that he did not recommend one course of action to the Defendant. He explained to her that she could not apply for judicial diversion if it was not included in the plea deal. He said that he discussed with her the potential outcomes of filing a suppression motion and taking the case to trial. He told the Defendant that there was a possibility that, if she did not succeed on the motion and the jury convicted her at trial, she could serve time in the penitentiary. Counsel said that

---

[1] Counsel said that "PDP" stood for possession of drug paraphernalia.

11

he told the Defendant that, without discovery, he could not determine the strength of her case but that the State's position was that, if she declined the State's offer, there would not be any future plea negotiations.

Counsel testified that the Defendant did not want to go to jail or risk the possibility of going to jail. He explained that, at the general sessions level, she was not entitled to discovery and, therefore, Counsel was not in a position to make a recommendation based on the strength of the case. He explained that he would be in a better position to evaluate the merits of the case in criminal court. The Defendant elected to waive her right to a preliminary hearing in order to enter the plea agreement with the State. Counsel testified that the Defendant was "absolutely" clear as of December 12, 2010, and January 19, 2011, that, based on the State's offer, she could not seek judicial diversion. Counsel said that he did tell the Defendant that he would continue trying to convince the State to change its position in this regard but that, as it stood, the plea agreement did not allow for judicial diversion.

Counsel testified that he spoke with the State's attorney on multiple occasions regarding judicial diversion. He explained to the State's attorney that the Defendant was a good student and had never been in trouble before this incident. He pointed out that the Defendant traveled abroad and hoped to pursue advanced degrees, both of which could be negatively impacted by the convictions.

Counsel read his notes from his first meeting with the Defendant as follows:

Confidential informant is named Chris. You'll get me his full name. Lydia was the only one present when the search warrant was executed. When [the Defendant] arrived, along with Luis, they sat her down, waited 30, 35 minutes to finish searching the residence, arrested her and took her downtown. They read her Miranda before interrogation. Lydia pointed out [the Defendant's] room to the police. [The Defendant] had a padlock on her door which the police had to unscrew before they could enter her room. [The Defendant] says she only had 3.5 grams of mushrooms in her room but it was in a gallon Ziploc bag which must be where the rest of the weight came from. The interrogation, . . . mushrooms, [the Defendant] admitted the mushrooms were hers, but never admitted to selling them and officers didn't ask if she sold them. She told them she got the mushrooms from Lydia. Weed, [the Defendant] did admit to selling a few bags of weed. [The Defendant] was interrogated the most about the weed.

Counsel testified that he made no attempt to contact the confidential informant but spoke with Lydia Mills' attorney. He said that his discussions with Mills' attorney did not reveal

12

any information he "deemed useful." Counsel said that Luis Gonzalez, the Defendant's boyfriend, was present at their first meeting, and he provided some information regarding a ledger found in the Defendant's bedroom.

Counsel testified that he believed a possible suppression motion in the Defendant's case would come down to whether or not her room was considered a subunit. Counsel said that he could not find any cases on point but believed there were issues upon which he could argue. He could not, however, definitively tell the Defendant that the outcome of the suppression motion would be successful. In weighing the merits of pursuing a suppression motion, Counsel considered that the Defendant would have to reject the State's offer and proceed to criminal court. Counsel said that the Defendant did not want to risk the possibility of the conviction or going to jail. Counsel said that he made no recommendations to the Defendant but rather explained her options and the risks and benefits of those options. He did tell the Defendant that he would prefer to have a hearing in order to obtain more information but that the State would consider the election to have a preliminary hearing a rejection of the offer.

Counsel acknowledged that the Schedule I drug listed in the indictment was psilocybin and that the drug listed on the Tennessee Bureau of Investigation forensic report was psilocin. He noted the discrepancy and, upon research, found that "psilocybin mushrooms were the natural occurring source of psilocin."

Counsel testified that the Defendant asked if it would be helpful to gather references and school records. Counsel told the Defendant that it "couldn't hurt," and the Defendant provided these items to him at the February 4, 2011, guilty plea submission hearing. Counsel said that, as soon as the Defendant arrived at court, he told her she would not be able to apply for judicial diversion. She asked Counsel if he still wanted the folder containing her school record and reference letters. Counsel said that he took the folder and tried to show the State's attorney the documents in support of his contention that the Defendant was a good candidate for diversion. The State's attorney declined the opportunity to look at the materials, and Counsel returned and told the Defendant judicial diversion was not an option. Counsel maintained that "all along" he told the Defendant she would be unable to apply for diversion. He said that he also told her she had the right to reject the plea agreement and let the charges proceed to the grand jury. Counsel said that the Defendant seemed "upset" that she could not apply for judicial diversion so, after reviewing the plea agreement, he left for about an hour to handle other cases in order to give the Defendant time to consider whether she wanted to enter the plea agreement.

Counsel identified an application he submitted to the Tennessee Bureau of Investigation for certification of eligibility for diversion. Counsel said that, although the

State had not agreed to include judicial diversion in the plea agreement, he sought the certificate in case the State changed its position before the plea submission hearing.

On cross-examination, Counsel testified that during his representation, the Defendant never indicated she wanted to go to trial. Counsel said that the Defendant's "main concern" was avoiding jail time and, in that respect, there was a good outcome. Counsel said that during his discussion with the Defendant, the Defendant initially denied telling police that she sold the mushrooms. As the discussion continued, she said that she could not remember whether or not she admitted to police selling mushrooms.

Counsel testified that on the plea submission hearing date, after telling the Defendant she could not apply for judicial diversion and giving her time to think over her decision, the Defendant told him she "definitely" wanted to enter a guilty plea, and she signed the plea agreement forms. Counsel said that the Defendant was not "dissatisfied" after entering her plea of guilty. He said that "she wasn't happy that she didn't get diversion, but she was happy that she wasn't facing going to prison."

Robert Lewis Jolley, Jr., testified as an expert witness in the area of ineffective assistance of counsel. Jolley stated that Counsel's performance did not meet "any objective standards of reasonableness that are required under our professional norms." Jolley identified two "issues" in the search warrant. The first was concerning whether or not there was sufficient corroboration of the confidential informant and, second, the use of the term psilocybin mushrooms versus psilocin in the TBI report. Jolley clarified that he was not contending that the affidavit did not establish probable cause but believed there were "legal issues as to whether or not it did establish probable cause." Jolley agreed that there was no Tennessee case law on point to support his assertion that the warrant was invalid but felt there was an opportunity for "argument."

After hearing the evidence, the trial court issued a written order denying the Defendant's motion to withdraw her guilty plea. It is from this judgment that the Defendant now appeals.

## II. Analysis

The Defendant appeals the trial court's denial of her motion to withdraw her guilty plea. She maintains that the trial court abused its discretion when it found that the Defendant had not proven that Counsel's representation prejudiced her. The State responds that the trial court did not abuse its discretion when it denied the motion to withdraw the Defendant's guilty plea because the Defendant failed to establish that her plea should be withdrawn to prevent a "manifest injustice."

The withdrawal of a plea of guilt is governed by Rule 32(f) of the Tennessee Rules of Criminal Procedure. Once the trial court imposes the sentence but before the judgment becomes final, the trial court "may set aside the judgment of conviction and permit the defendant to withdraw the plea to correct manifest injustice." Tenn. R. Crim. P. 32(f)(2). Our Supreme Court has stated:

> Withdrawal to correct manifest injustice is warranted where: (1) the plea "was entered through a misunderstanding as to its effect, or through fear and fraud, or where it was not made voluntarily"; (2) the prosecution failed to disclose exculpatory evidence as required by *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed.2d 215 (1963), and this failure to disclose influenced the entry of the plea; (3) the plea was not knowingly, voluntarily, and understandingly entered; and (4) the defendant was denied the effective assistance of counsel in connection with the entry of the plea.

*State v. Crowe*, 168 S.W.3d 731, 742 (Tenn. 2005). This Court has also held that "[w]here there is a denial of due process, there is a 'manifest injustice' as a matter of law." *State v. Davis*, 823 S.W.2d 217, 220 (Tenn. Crim. App. 1991). "Conversely, a trial court will not, as a general rule, permit the withdrawal of a plea of guilty to prevent 'manifest injustice' when the basis of the relief is predicated upon (a) an accused's change of heart, (b) the entry of the plea to avoid harsher punishment, or (c) an accused's dissatisfaction with the harsh punishment imposed by a trial court or a jury." *State v. Turner*, 919 S.W.2d 346, 355 (Tenn. Crim. App. 1995).

The appellate court is bound to uphold the trial court's determinations regarding the withdrawal of a guilty plea unless the record demonstrates that the trial court abused its discretion. *Id.*; *State v. Drake*, 720 S.W.2d 798, 799 (Tenn. Crim. App. 1986). A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party. *State v. Jordan*, 325 S.W.3d 1, 39 (Tenn. 2010). An abuse of discretion exists if it appears that there is no substantial evidence in the record to support the trial court's conclusion. *Goosby v. State*, 917 S.W.2d 700, 705 (Tenn. Crim. App. 1995). This Court will also find an abuse of discretion when the trial court has failed to consider the relevant factors provided by higher courts as guidance for determining an issue. *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007).

The "manifest injustice" standard "is based 'upon practical considerations important to the proper administration of justice.'" *Crowe*, 168 S.W.3d at 741 (quoting *Kadwell v. United States*, 315 F.2d 667, 670 (9th Cir. 1963)). While the term "manifest injustice" has not been defined by statutory or case law, "courts have identified on a case-by-case basis

circumstances that meet the manifest injustice standard necessary for withdrawal of a plea." *See State v. Turner*, 919 S.W.2d 346, 355 (Tenn. Crim. App. 1995).

The Defendant asserts that she received the ineffective assistance of counsel and that she should, therefore, be permitted to withdraw her guilty plea to correct a "manifest injustice." Specifically, the Defendant claims that Counsel was ineffective for failing to: (1) file a motion to suppress the evidence obtained during the execution of the search warrant; (2) adequately communicate with the Defendant regarding the option of judicial diversion; and (3) notify the trial court of the circumstances under which the Defendant was entering her plea of guilt. The Defendant also makes an argument that the trial court applied the incorrect legal standards in denying her motion. As the trial court's application of legal standards is inherent in our review, we do not address this issue separately but as part of each issue addressed below.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

As to the deficient representation prong of the test, the defendant must establish that "the advice given or the service rendered was not within the range of competence demanded of attorneys in criminal cases[.]" *Bankston v. State*, 815 S.W.2d 213, 215 (Tenn. Crim. App. 1991). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, *see Strickland*, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. *See Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). The reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466

16

U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988).

As to the prejudice prong of the test, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. When a defendant has entered a guilty plea, he must establish a reasonable probability that, but for the errors of counsel, he would not have pleaded guilty and would have insisted on going to trial. *See Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

Courts need not approach the *Strickland* test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim"). Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996).

### A. Motion to Suppress

The Defendant argues that Counsel's failure to file a motion to suppress constituted the ineffective assistance of counsel and warrants withdrawal of her guilty plea. In the context of suppression motions, the Defendant carries the burden of establishing a reasonable probability that, had trial counsel filed a motion to suppress, the motion would have been granted. *See Keven Scott v. State*, No. W2010-02515-CCA-R3-PC, 2011 WL 5903933, at *9 (Tenn. Crim. App., at Jackson, Nov. 22, 2011), *perm. app. denied* (Tenn. April 12, 2012) (citing *Strickland*, 466 U.S. at 694).

At the motion hearing, Counsel stated that he interviewed the Defendant as to the events surrounding the search, reviewed the search warrant, and researched the law. He said that he could not find any cases on point, but believed there were issues upon which he could argue. He stated that, based on the law, he could not definitively tell the Defendant that the outcome of a suppression motion would be successful. He explained that the pursuit of a suppression motion would effectively be a refusal of the State's offer and, if the suppression motion were denied and she proceeded to trial, she could serve jail time. The Defendant did not want to risk the possibility of going to jail or the felony conviction and testified that her "overriding concern" was the avoidance of jail time. We have stated previously that, "if arguable grounds exist to suppress incriminating evidence, then an attorney, as a zealous advocate for the client, should move to suppress that evidence." *Samuel L. Giddens v. State*, No. M2006-01938-CCA-R3-PC, 2008 WL 271967, at *6 (Tenn. Crim. App., at Nashville,

Jan. 29, 2008) (quoting *Steven Bernard Wlodarz v. State*, No. E2002-02798-CCA-R3-PC, 2003 WL 22868267, at *6 (Tenn. Crim. App., at Knoxville, Dec. 3, 2003), *perm. app. granted* (Tenn. Feb. 23, 2012)). The importance of a motion to suppress may be of particular importance in a drug case "where the ruling on a motion to suppress is often determinative of the case." *Id*.

We need not address whether a motion to suppress should have been filed in this case because, after a careful review of the record, we conclude that the Defendant has failed to establish that she was prejudiced by Counsel's failure to file such a motion. To meet her burden of showing prejudice, the Defendant must establish that there is a reasonable probability that, had trial counsel filed a motion to suppress, the motion would have been granted. *Id*. (citing *Strickland*, 466 U.S. at 694). Here, the Defendant has failed to do so. Under the facts of this case, the Defendant must have adduced sufficient facts to allow the trial court to conclude that the search was illegal based upon an invalid warrant. To the contrary, the facts in the instant case do not lead to such a conclusion.

The record is limited in this case as to the evidence that would have been presented at a suppression hearing. The Defendant, however, bears the burden of proving the alleged prejudice. In this case, the Defendant has simply failed to satisfy that burden. This Court has previously held that when a defendant asserts that trial counsel was ineffective for failing to file pre-trial motions, the defendant "should incorporate a motion to suppress within the proof." *Terrance Cecil v. State,* No. M2009-00671-CCA-R3-PC, 2011 WL 4012436, at *8 (Tenn. Crim. App., at Nashville, Sept.12, 2011), *no Tenn. R. App. P. 11 perm. app. filed*.

The Defendant states that the trial court's denial of her motion for discovery prevented her from presenting the necessary facts to support her argument with regard to the suppression motion. We find this argument unpersuasive. It is evident from the record that the Defendant was fully aware that Officer Geddings swore out and executed the warrant, that Lydia Mills allegedly spoke with officers about the Defendant's room, and that her other roommates were present during the search. She did not call any of these witnesses. This Court's role is not to speculate as to what potential witnesses might have said at the hearing. *See Black v. State*, 749 S.W.2d 752, 757 (Tenn. 1990).

The trial court properly found that the Defendant failed to prove that she was prejudiced by Counsel's failure to file a suppression motion. The Defendant is not entitled to relief.

**B. Judicial Diversion**

The Defendant argues that the evidence preponderates against the trial court's finding

18

that the Defendant was aware that an application for diversion was not part of the plea agreement. She claims that the evidence instead indicates that Counsel's "erroneous advice" regarding diversion renders her plea involuntary. The State responds that the record reflects that the trial court complied with Rule 11 of the Tennessee Rules of Criminal Procedure and that the Defendant knowingly and voluntarily entered the guilty plea. We agree with the State.

Specifically, the Defendant takes issue with two of the trial court's credibility determinations in his January 9, 2012 order denying her motion to withdraw. The first of which is:

> In summary, [the Defendant's] position is that at all times she thought that she would be allowed to apply for diversion. On February 4, she learned for the first time that she would not be allowed to apply for diversion. The Court does not credit this testimony.

The second of the two determinations the Defendant challenges is as follows:

> [Counsel] testified that he left [the Defendant] in order to go to another court. He returned almost one hour later and the plea was entered. The Court accredits this testimony and finds that from the initial plea offer, [the Defendant] was aware that an application for diversion was not part of the plea agreement.

We first note that questions regarding the credibility of witnesses are matters entrusted to the trial court as the trier of fact. *Dellinger v. State*, 279 S.W.3d 282, 292 (Tenn. 2008) (citing *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). The trial court is in the best position to observe witnesses and assess credibility. Here, the trial court listened to the testimony while observing the witnesses and, thereafter, credited Counsel's testimony that he informed the Defendant that judicial diversion was not part of the State's plea offer and that on the day of the plea submission hearing the Defendant had more than "minutes" to make a decision. It is not the function of this Court to reweigh the credibility of witnesses on appeal. *State v. Smith*, 24 S.W.3d 274, 278-79.

Further, the evidence does not preponderate against the trial court's findings in this regard. The Defendant admitted that she knew that judicial diversion was not part of the plea agreement. She states that she believed Counsel was continuing to pursue the option of judicial diversion. This does not negate or change the fact that she knew that judicial diversion was not part of the State's plea offer, as evidenced by her signature on the January 19, 2011 paperwork. The signed documents evidence her agreement to the State's offer,

19

which did not include judicial diversion. The evidence indicates that the Defendant knew on the day of the guilty plea submission hearing that judicial diversion was not part of the agreement and yet she still proceeded with her guilty plea. The Defendant testified that she had "minutes" to make her decision, while Counsel testified that he left the Defendant for an hour to think over the State's offer. He advised her that she did not have to plead guilty and could instead let her case proceed to the grand jury. The Defendant, a college-educated woman, told Counsel on three occasions that she wished to proceed with the guilty plea. At the guilty plea hearing, she testified that she was voluntarily entering the guilty plea and understood her rights and the waiver of the rights. The Defendant testified that her "overriding concern" was that she not serve jail time. Counsel negotiated a plea agreement with the State that allowed a reduced probatable sentence that did not include jail time, as the Defendant had requested.

The evidence supports the trial court's findings that Counsel adequately informed the Defendant throughout the proceedings of the status of the plea agreement with the State. The record also demonstrates that the Defendant knowingly, intelligently, and voluntarily entered the guilty plea as evidenced by the guilty plea hearing transcript and the Defendant's own testimony that she "voluntarily entered" her guilty plea. The Defendant is not entitled to relief as this issue.

### C. Failure to Notify Court

The Defendant's final argument is that Counsel should have notified the trial court that the "State refused to allow [the Defendant] to apply for judicial diversion[,] that the [S]tate had provided no discovery to the defense[,] and that the defense had no basis other than statements of the prosecutor as to what evidentiary support the [S]tate has for its case."

The Defendant offers no law in support of the contention that attorneys are required to notify the trial court of the details surrounding the plea agreement, nor are we aware of any such case law, rule, or statute requiring this procedure. We find no basis for finding Counsel ineffective in this regard. The Defendant is not entitled to relief.

### III. Conclusion

Based on the foregoing and the record, we conclude that the trial court did not abuse its discretion in denying the Defendant's motion to withdraw her guilty plea. Therefore, we affirm the trial court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE

20